## JOHN KNIGHT v. THE STATE.

### No. 3943. Decided March 1, 1916.

**1.—Murder—Continuance—Materiality of Testimony—Threats—Insult to Female Relative.**

Where, upon trial of murder, the defendant testified that the wife of the deceased had informed him of a threat of deceased against the defendant, and insulting language about his daughters, whereupon the State called said witness and she promptly denied doing so, and defendant's application for a continu-

ance showed that he had used due diligence in procuring the attendance of a wholly disinterested witness who would testify that she was present when the State's witness did so inform defendant of said threats by deceased, and said insulting language with reference to defendant's daughters, and it further appeared from the record that the homicide occurred upon the first meeting after this insulting language was communicated to defendant, and that thereby the jury would likely have found the defendant guilty of manslaughter instead of murder, a motion for a new trial should have been granted.

### 2.—Same—Rule Stated—Continuance—Discretion of Court.

While an application for continuance is no longer a matter of right but is addressed to the sound discretion of the court, yet in passing on the question as to whether error was committed by the trial court, the matter must be viewed in the light of the entire record when it is again presented as error in the motion for new trial, and a new trial should be granted if the defendant was deprived of material testimony by reason of the absent witness.

### 3.—Same—Evidence—Conversation.

Where the State elicits a part of a conversation against the defendant, the latter should be permitted to introduce in evidence what was said by all the parties engaged in that conversation.

### 4.—Same—Newly Discovered Evidence—Practice on Appeal.

Where the judgment is reversed and the cause remanded upon other grounds, the question of newly discovered testimony need not be considered on appeal.

Appeal from the District Court of Hardin. Tried below before the Hon. L. B. Hightower.

Appeal from a conviction of murder; penalty, fifteen years imprisonment in the penitentiary.

The opinion states the case.

*Stevens & Stevens, Singleton & Nall,* and *Lane, Wolters & Storey,* for appellant.—On question of overruling motion for continuance: Morgan v. State, 54 Texas Crim. Rep., 542, 113 S. W. Rep., 934; Cameron v. State, 57 Texas Crim. Rep., 316, 122 S. W. Rep., 870; Hays v. State, 73 Texas Crim. Rep., 58, 164 S. W. Rep., 841; Harris v. State, 172 S. W. Rep., 1146; Rhea v. State, 67 Texas Crim. Rep., 197, 148 S. W. Rep., 578.

On question of admitting conversations in evidence: Pratt v. State, 53 Texas Crim. Rep., 281; Woodward v. State, 50 id., 294; Jones v. State, 59 id., 559; Lowry v. State, 53 id., 562; Taylor v. State, 75 Texas Crim. Rep., 20, 169 S. W. Rep., 672; Moran v. State, 73 Texas Crim. Rep., 525, 166 S. W. Rep., 161.

*C. C. McDonald,* Assistant Attorney General, for the State.

HARPER, JUDGE.—Appellant was convicted of murder and his punishment assessed at fifteen years confinement in the State penitentiary.

The State's case is, that ill-will existed between appellant and his brother-in-law, J. M. Wilson, deceased. The State does not undertake to show the specific cause of the trouble between the two men, and the

reason for the existence of the ill-will, further than to show that deceased had been informed that appellant had employed Eugene Dagle to whip him, deceased. With this proof, the State then showed that on the morning of the difficulty appellant went to the town of Batson, armed with a shotgun, and went into the Mateson saloon and looked around in there as if seeking someone, and then went on out in front of Perkins' butcher shop. After he had been sitting there a few minutes deceased came driving down the street, as the State contends, with a whip in one hand, and the buggy lines in the other. As he got opposite appellant, appellant shot, deceased falling out of the buggy. After he fell appellant shot again; that while deceased was on his all-fours struggling to get up, appellant loaded his gun, stepped near to him and again shot him.

The testimony offered in behalf of appellant would show ill-will of long standing existing on the part of deceased; that during the week before the homicide deceased while talking to E. McClendon had said nothing but a shotgun would settle the trouble between him and appellant, and during the conversation had made remarks severely reflecting on the family and daughters of defendant. Appellant, his wife and daughters testify that two days after this conversation with McClendon deceased came to the home of appellant, armed with a shotgun, with the apparent intention of killing appellant, but was prevented by Mrs. Knight, and the flight of appellant; that as he left he called appellant's daughter "a God damned white headed little bitch," and called to appellant, "God damn you, you needn't run, I am going to kill you anyhow." Mrs. Budrou and her son, Gus Budrou, both testify that on Saturday before the homicide, deceased was at their home and in a conversation with them, Gus Budrou testifies, he said: " 'Mrs. Budrou, I guess you heard that I killed John Knight?' He was talking to my mother. She said, 'No, Mr. Wilson, I heard that you tried to kill him,' and he said, 'Yes, I went there to kill him, but I didn't kill him; his wife and one of his girls was the cause of me not killing him,' and he said, 'Mrs. Budrou, this will never be settled until one of us dies,' and he said, 'The man that pulls the trigger first is the man that lives the longest. This is all about his bunch of bitches.' He was referring to Mr. Knight's girls when he used those names. He was talking to mamma, and she said, 'I thought them were ladies, and I didn't know they was that kind of people,' and he said, 'Mrs. Budrou, you know that old negro Glory,—negro woman in Batson?' And she said, 'Yes,' and he said, 'They are lower down than her.' And she said, 'You ought to be careful how you are talking that way, you know if Mr. Knight gets hold of that there is liable to be trouble.' And he said, 'I don't care if he gets hold of it or not, you can tell the old son-of-a-bitch if you want to.' "

Gus Budrou also testifies he told appellant about this conversation the same day. Appellant then testifies that after having been told of these matters by McClendon and Gus Budrou, he purchased some buckshot shells and carried his gun with him to defend himself. Mr. H. G.

Camp testifies that he had some business with appellant, and while on his way to see him he met Mr. Wilson, the deceased, and Wilson had said, "If you have got any business with that old bastard you had better fix it up, because I am going to fix him when I catch him from the house." Defendant's testimony would show that he was informed of all these matters, and that he made an engagement with Mr. Camp to meet him in Batson on the day of the homicide, and he was there for that purpose, and says he was in front of Perkins' butcher shop waiting for Mr. Camp, as that was the place they had agreed to meet. He and his witnesses would have deceased come driving down the street, and as he got opposite appellant he reached with his right hand into the bottom of his buggy, looking at appellant, when appellant shot. Appellant testified that from the previous acts and conduct of deceased, and the conversations with deceased reported to him, he believed deceased was reaching for a weapon with which to kill him.

The above synopsis presents a general outline of the two theories, and is sufficient to render intelligible the disposition of the three questions presented by appellant for a reversal of the case.

When the case was called for trial appellant moved to continue the case on account of the absence of Mrs. Mary Riley, whom the record shows was prevented from attending court by the sickness of one of her children. By Mrs. Riley appellant states he expected to prove the facts hereinafter recited. In passing on the question of whether or not error was committed by the court, the matter must be viewed in the light of the entire record, when it was again presented as error in the motion for a new trial. A continuance is no longer a matter of right, but is a matter addressed to the sound discretion of the court, and the court has a right to and should view the application in the light of the evidence introduced on the trial, in passing on whether or not appellant should be granted a new trial on account of being deprived of the testimony of the witness. On the trial of the case appellant, when testifying as a witness in his own behalf, testified that Mrs. Wilson, wife of deceased, prior to the homicide, had told him, "Wilson is going to kill you, and you had better watch him." After he had so testified, the State called Mrs. Wilson as a witness and she testified, "I never told John Knight that he had better watch my husband; I never told John Knight that my husband was going to kill him." Attached to the motion for a new trial is the affidavit of Mrs. Riley, in which, after giving her reason for not attending court, she swears: "That Mrs. J. M. Wilson, wife of deceased, did tell John Knight in her presence, that said J. M. Wilson had threatened to kill him, the said John Knight, and that he had better watch the said Wilson." She furthermore says that she would testify that a few days prior to the homicide deceased had told her, affiant, that he had recently gone to the home of John Knight, appellant, and had drawn a gun on him, and had made him hold up his hands to his Jesus, and had said he would get John Knight yet, and that he had called Annie Knight a white-haired bitch." On the trial of the case the State had seriously con-

tested the fact that deceased had ever threatened to kill appellant, and seriously contested that deceased had ever at any time used language reflecting on appellant's daughters. If when defendant proved by other witnesses that deceased had threatened him, and had called his daughters bitches, etc., the State had not contested that fact, then the materiality of this testimony would not be so apparent. But it did contest both issues, and it is made manifest by the contention of the State's counsel in this court. When the defendant testified Mrs. Wilson had informed him of the threat, the State called Mrs. Wilson and she promptly denied doing so, and here is a wholly disinterested witness who would swear that Mrs. Wilson did so inform appellant, and would swear that deceased admitted to her he had used language to appellant's daughters that would inflame the mind of any man, and this was the first meeting after deceased had used the language he admitted having used. Appellant was found guilty of murder and not manslaughter, whereas if the jury had found that deceased had used about and to appellant's daughters the vile language the witnesses attribute to him, and killed him on the first meeting, they would likely have found him guilty of no higher grade of offense than manslaughter. In the light of the evidence adduced on the trial we think a new trial should have been granted on account of appellant having been deprived of the testimony of Mrs. Riley. It was material, and he had used diligence to secure her attendance. She swears she would have so testified had she been in attendance, and we can not say her testimony would not have produced a different result.

The next contention of appellant is that the court erred in excluding what was said by Mrs. Knight during a conversation introduced by the State through Mr. Carouthers. Appellant testified as to what occurred when deceased came to his home on Saturday. In rebuttal the State called Mr. Carouthers, and had him detail how appellant had told him the occurrence happened, and they varied materially on one or more important statements. Appellant testified that when deceased asked if he had not employed Dagle to whip him, and appellant replied, "No," deceased responded, "There is no apology accepted in this case." Carouthers testified that appellant in telling him about the transaction had said deceased remarked, "Then there was no apology to make." Mrs. Knight's remarks would shed no light on which was the correct version as to that statement, and we would not reverse the case alone because of the exclusion of her remarks. However, on another trial if the State seeks to elicit a part of the conversation occurring at this time as evidence against appellant, then if appellant desires to do so, he should be permitted to introduce what was said by all the parties engaged in that conversation, if it tends in the least to throw any light on the language of appellant that it is sought to use to his detriment.

As to the newly discovered testimony, we do not deem it necessary to pass on the question of whether or not it presents error. On another

trial it will not be newly discovered, and can be introduced if appellant
desires to do

The judgment is reversed and the cause is remanded.

*Reversed and remanded.*